John P. Kristensen (SBN 224132)
**KRISTENSEN LAW GROUP**
120 Santa Barbara Street, Suite C9
Santa Barbara, California 93101
Telephone: 805-837-2000
john@kristensen.law

Leigh S. Montgomery*
Texas Bar No. 24052214
lmontgomery@eksm.com
**EKSM, LLP**
4200 Montrose Blvd., Suite 200
Houston, Texas 77006
Phone: (888) 350-3931
Fax: (888) 276-3455

**COUNSEL FOR PLAINTIFF AND THE PUTATIVE CLASS**
(* denotes *pro hac vice* forthcoming)

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| BLAKE MIJANGOS, individually and on behalf of all others similarly situated, | ) Case No. 5:25-cv-08580 |
| | ) |
| Plaintiff, | ) **CLASS ACTION COMPLAINT FOR** |
| | ) **DAMAGES:** |
| | ) |
| vs. | ) 1. **Negligence;** |
| | ) 2. **Breach of Implied Contract; and** |
| PAYACTIV, Inc., | ) 3. **Unjust Enrichment.** |
| | ) |
| Defendant. | ) **DEMAND FOR JURY TRIAL** |
| | ) |
| | ) |

Plaintiff Blake Mijangos ("Plaintiff"), individually and on behalf of all others similarly situated ("Class Members"), brings this Class Action Complaint against Payactiv, Inc. ("Payactiv" or "Defendant"), and alleges, upon personal knowledge as to his own actions and his counsel's investigations, and upon information and belief as to all other matters:

## I.   **INTRODUCTION**

1.       This Class action arises out of the recent data security incident and data breach that was perpetrated against Defendant (the "Data Breach"), which held in its possession certain

personally identifiable information ("PII") of the Plaintiff and other current and former customers and employees of Defendant, the putative class members ("Class"). This Data Breach occurred between April 3, 2025, and August 20, 2025.[1]

2.    Based on Defendant's report to the Montana Department of Justice, the Private Information for 174 Montanans alone were impacted by the Data Breach.[2] Defendant has also reported to the Attorneys General of Vermont and New Hampshire that residents of those states were impacted by the Data Breach.[3]

3.    On September 26, 2025, Defendant mailed data breach notification letters to impacted individuals informing them of a cyberattack ("the Data Breach") and admits that their Private Information was impacted by the Data Breach. The Private Information compromised in the Data Breach includes names and Social Security numbers.[4]

4.    Defendant is a national financial services company that provides clients with access to their earned wages before payday.

5.    Plaintiff is a former employee of Defendant who received a letter in the mail from Defendant informing him that his Private Information was impacted in the data breach.

6.    Plaintiff brings this class action lawsuit on behalf of himself, and those similarly situated to address Defendant's inadequate safeguarding of Class Members' Personal Information that it collected and maintained, and for failing to provide adequate notice to Plaintiff and other Class Members that their information was likely accessed by an unknown third party and precisely what type of information was accessed.

7.    Defendant maintained the Private Information in a reckless and negligent manner. In particular, the Private Information was maintained on Defendant's computer system and network in a condition vulnerable to cyberattack.

---

[1] Montana Department of Justice, *Office of Consumer Protection, Reported Data Breaches*, available at https://dojmt.gov/office-of-consumer-protection/reported-data-breaches/
[2] *Id.*
[3] See Vt. Att'y Gen., *Payactiv, Inc. Data Breach Notice to Consumers* (Sept. 30, 2025), https://ago.vermont.gov/document/2025-09-30-payactiv-data-breach-notice-consumers; N.H. Att'y Gen., *Payactiv, Inc. Data Breach Notice to Consumers* (Sept. 29, 2025), https://mm.nh.gov/files/uploads/doj/remote-docs/payactiv-20250929.pdf.
[4] Exhibit A, *Data Breach Letter*, attached hereto.

8.    Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class Members' Personal Information was a known risk to Defendant and thus Defendant was on notice that failing to take steps necessary to secure the Personal Information from those risks left that information in a dangerous condition.

9.    Because of the Data Breach, Plaintiff and Class Members suffered ascertainable losses in the form of the loss of the benefit of their bargain, out-of-pocket expenses, and the value of their time reasonably incurred to remedy or mitigate the effects of the attack and the substantial and imminent risk of identity theft.

10.    By obtaining, collecting, using, and profiting from the Private Information of Plaintiff and Class Members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion. Defendant admits that the unencrypted Private Information was impacted during the Data Breach.

11.    The exposed Private Information of Plaintiff and Class Members can—and likely will—be sold on the dark web. Indeed, Plaintiff's, and Class Members' Private Information has likely already been published on the dark web.

12.    Hackers can offer for sale the unencrypted, unredacted Private Information to criminals. Plaintiff and Class Members now face a lifetime risk of identity theft, which is heightened here by the loss of Social Security numbers—the gold standard for identity thieves.

13.    This Private Information was compromised because of Defendant's negligent and/or careless acts and omissions and the failure to protect the Private Information of Plaintiff and Class Members.

14.    Plaintiff and Class Members had no idea their Private Information had been compromised, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their lifetimes.

15.    Plaintiff brings this action on behalf of all persons whose Private Information was compromised because of Defendant's failure to: (i) adequately protect the Private Information of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of Defendant's inadequate information security practices; and (iii) effectively secure hardware containing protected Private

Information using reasonable and effective security procedures free of vulnerabilities and incidents. Defendant's conduct amounts to negligence and violates federal and state statutes.

16. Plaintiff and Class Members have suffered injuries because of Defendant's conduct. These injuries include:

    (i) lost or diminished value of Private Information;

    (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information;

    (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including, but not limited to, lost time; and

    (iv) the continued and exacerbated risk to their Private Information which:

        a. remains unencrypted and available for unauthorized third parties to access and abuse; and

        b. may remain backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

17. Defendant disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, and/or negligently failing to take and implement adequate and reasonable measures to ensure that the Private Information of Plaintiff and Class Members was safeguarded. Defendant further disregarded their rights by failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures for the encryption of data, even for internal use.

18. Because of the Data Breach, the Private Information of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

II. **PARTIES**

19. Plaintiff Blake Mijangos is a citizen of Salt Lake City, Utah. He received notice from Defendant that it lost control of his PII.

20.    Defendant is a Delaware corporation maintaining its principal place of business at 400 N. McCarthy Blvd, Suite 200, Milpitas, California, 95035.

## III.    JURISDICTION AND VENUE, AND INTRA-DISTRICT ASSIGNEMENT

21.    Jurisdiction is proper in this Court under 28 U.S.C. § 1332 (diversity jurisdiction). Specifically, this Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action where the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class and at least one other Class Member is a citizen of a state different from Defendant, including Plaintiff.

22.    Defendant is headquartered and routinely conducts business in the State where this District is located, has sufficient minimum contacts in this State and has intentionally availed itself of this jurisdiction by marketing and selling products and services, and by accepting and processing payments for those products and services within this State.

23.    Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events that gave rise to Plaintiff's claims took place within this District, and Defendant does business in this Judicial District.

24.    Pursuant to Civil Local Rules 3-2(c) and 3-2(e), assignment to the San Jose Division of the Northern District of California is appropriate because the events giving rise to this action occurred in Santa Clara County, where Defendant resides and conducts business.

## IV.    FACTUAL ALLEGATIONS

### Defendant's Business

25.    Defendant is a company that provides employees with access to their earned wages before payday, helping them avoid high-interest loans and overdraft fees.[5] Defendant boasts on its website that it began in 2012 and now serves more than 2 million people.[6]

26.    In the ordinary course of doing business with Defendant, each customer must provide (and Plaintiff did provide) Defendant with sensitive, personal, and private information, such as his or

---

[5] https://www.payactiv.com
[6] Id.

her:

- Address;

- Telephone number;

- Date of birth;

- Social Security number;

- Driver's License number;

- Driver's License state;

- Financial account information;

27.    Defendant agreed to and undertook legal duties to maintain the protected personal information entrusted to it by Plaintiff and Class Members safely, confidentially, and in compliance with all applicable laws.

28.    The customer and employee information held by Defendant in its computer system and network included the Private Information of Plaintiff and Class Members.

### The Data Breach

29.    A Data Breach occurs when cyber criminals intend to access and steal Private Information that has not been adequately secured by a business entity like Defendant.

30.    Defendant recently identified a cybersecurity incident on its IT Network.[7] In response, Defendant launched an investigation to determine the nature and scope of the Data Breach.[8] Through its investigation, Defendant confirmed that an unauthorized actor accessed the company's systems, gaining unauthorized visibility into sensitive customer data.[9]

31.    After extensive analysis, Defendant determined that the Data Breach occurred on September 12, 2025, and that the following types of Private Information were compromised: name and Social Security number.[10]

32.    Defendant had obligations created by contract, industry standards, common law, and representations made to its employees, customers, and to Plaintiff and Class Members, to keep Class

---

[7] *Exhibit A.*
[8] *Id.*
[9] *Id.*
[10] *Id.*

Members' Private Information confidential and to protect it from unauthorized access and disclosure. Defendant agreed to and undertook legal duties to maintain the protected Private Information entrusted to it by Plaintiff and Class Members safely, confidentially, and in compliance with all applicable laws. Defendant assumed legal and equitable duties and knew or should have known that it was responsible to protect Plaintiff's, and Class Members' Private Information from unauthorized disclosure.

33.     Plaintiff and Class Members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

34.     Defendant had a duty to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties. Defendant has a legal duty to keep Plaintiff's and Class Members' PII safe and confidential.

35.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

36.     Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting institutions that collect and store PII, like Defendant, preceding the date of the Data Breach.

37.     As reported by the Identity Theft Resource Center, in 2023 a record 3,205 data breaches occurred, resulting in around 353,027,892 individuals' information being compromised, a 78% increase from 2022.[11] Of the 2023 recorded data breaches, 744 of them, or 23%, were in the financial services industry.[12] The 744 breaches reported in 2023 exposed nearly 61 million sensitive records. This is up from 2022 in which there were a reported 269 breaches that exposed approximately 27 million sensitive records.[13]

///

---

[11]     *See* Identity Theft Resource Center, *2023 Data Breach Report* (January 2024), *available at* https://www.idtheftcenter.org/publication/2023-data-breach-report/ (*last accessed* May 22, 2025).
[12] *Id.*
[13] *Id.* at 11, Fig.3.

38.     Data breaches such as the one experienced by Defendant have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack.

39.     Data thieves regularly target institutions like Defendant due to the highly sensitive information in its custody. Defendant knew and understood that unprotected PII is valuable and highly sought after by criminal parties who seek to illegally monetize that PII through unauthorized access.

40.     The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant. According to IBM's 2022 report, "[f]or 83% of companies, it's not if a data breach will happen, but when."[14]

41.     Unfortunately, Defendant failed to take adequate measures to protect Plaintiff's and Class Members' PII stored on its computer servers, including failing to implement reasonable cybersecurity safeguards or policies to protect PII, and failing to supervise its information technology or data security agents and employees, or vendors, to prevent, detect, and stop breaches of its systems.

42.     As a direct result of Defendant's failures, on or about April 3, 2025, cybercriminals infiltrated Defendant's systems, gained access to, and copied, the PII of Plaintiff and Class Members ("the Data Breach").

43.     As a result of the Data Breach, its victims face a lifetime risk of identity theft, as it includes sensitive information that cannot be changed, like their Social Security numbers. Accordingly, the credit monitoring and identity theft protection which Defendant offered in the Notice of Data Breach are wholly insufficient to compensate Plaintiff and the Class Members for their damages resulting from the Data Breach.

44.     Defendant's offer to supply Plaintiff and the Class Members with credit monitoring services supports the reasonable belief that, Plaintiff's and the Class Members' PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

///

///

---

[14] IBM, *Cost of a Data Breach 2022: A Million-Dollar Race to Detect and Respond*," https://www.ibm.com/reports/data-breach (last visited Apr. 30, 2025).

*Data Breaches Are Preventable*

45.    Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

46.    Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

47.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[15]

48.    To prevent and detect cyber-attacks and/or ransomware attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need

---

[15] How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view

for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[16]

49.    To prevent and detect cyber-attacks or ransomware attacks, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure Internet-Facing Assets**

-    Apply latest security updates

-    Use threat and vulnerability management

-    Perform regular audit; remove privileged credentials.

///

///

///

---

[16] *Id.* at 3-4.

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise.

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely.

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords.

**Apply principle of least-privilege**

- Monitor for adversarial activities

- Hunt for brute force attempts

- Monitor for cleanup of Event Logs

- Analyze logon events.

**Harden infrastructure**

- Use Windows Defender Firewall

- Enable tamper protection

- Enable cloud-delivered protection

- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[17]

50.    Given that Defendant was storing the Private Information of its current and former customers, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

51.    The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and data thieves acquiring and accessing the Private Information of, upon information and belief, thousands to tens of thousands of individuals, including that of Plaintiff and Class Members.

---

[17] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/

52.    The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and data thieves acquiring and accessing the Private Information of, upon information and belief, thousands to tens of thousands of individuals, including that of Plaintiff and Class Members.

***Plaintiff's Experience***

53.    As a consequence of the unauthorized access to Defendant's computer network, Plaintiff's and Class Members' Private Information was exposed to cybercriminals. Plaintiff received a notice from Defendant on or around September 26, 2025, that his Private Information was accessed in the Data Breach.

54.    Plaintiff was an employee working for Defendant.

55.    Plaintiff is careful about sharing his Private Information and has never knowingly transmitted unencrypted sensitive Private Information over the internet or through any other unsecured source. Plaintiff stores documents containing sensitive Private Information in safe and secure locations or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for his sensitive online accounts.

56.    Plaintiff provided Defendant with certain Private Information as a necessary part of receiving employment from Defendant and, but for the Defendant's Data Breach, Plaintiff's personally identifiable information would not have been disclosed to cyber threat actors and would not be at risk of being exposed on the dark web.

57.    Plaintiff now bears the burden of dealing with the consequences of the Data Breach because Defendant advised Plaintiff that he needs to take certain steps to protect his Private Information and otherwise mitigate his damages. And since receiving Defendant's notice of the Data Breach Plaintiff has and will continue spending time dealing with the consequences of the Data Breach. This includes time spent verifying the legitimacy of the Notice of Data Breach and self-monitoring his financial accounts, credit reports, and government services accounts to ensure no fraudulent activity has occurred.

58.    This time spent at Defendant's direction has been lost forever and cannot be recaptured.

///

59.     Further, even with the best response, the harm caused to Plaintiff cannot be undone because notorious cybercriminals have claimed to possess the data and have threatened to release the data, and Defendant has not yet been able to assure Plaintiff that the data possessed by the unauthorized actor has been destroyed along with the threat of future release. As the Cybersecurity and Infrastructure Security Agency reports in its blog, *Protecting Against Ransomware*, "[e]ven after a ransom has been paid to unlock encrypted files, threat actors will sometimes demand additional payments…"[18]

60.     Plaintiff has suffered actual injury in the form of damages to and diminution in the value of their Private Information. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

61.     Plaintiff has suffered imminent and impending injury arising from the exacerbated risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of unauthorized third parties who are criminals.

62.     Plaintiff has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

### Value of Private Information

63.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[19] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[20]

---

[18] CISA, *Protecting Against Ransomware*, Apr. 11, 2019 Rev. Sept. 2, 2011, https://www.cisa.gov/news-events/news/protecting-against-ransomware
[19] 17 C.F.R. § 248.201 (2013).
[20] *Id.*

64.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[21]

65.     For example, Personal Information can be sold at a price ranging from $40 to $200.[22] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[23]

66.     Of course, a stolen Social Security number – standing alone – can be used to wreak untold havoc upon a victim's personal and financial life.   The popular person privacy and credit monitoring service LifeLock by Norton notes "Five Malicious Ways a Thief Can Use Your Social Security Number," including 1) Financial Identity Theft that includes "false applications for loans, credit cards or bank accounts in your name or withdraw money from your accounts, and which can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud and employment fraud; 2) Government Identity Theft, including tax refund fraud; 3) Criminal Identity Theft, which involves using someone's stolen Social Security number as a "get out of jail free card;" 4) Medical Identity Theft, and 5) Utility Fraud.

67.     It is little wonder that courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers, which were compromised for some Class Members in the Data Breach, are among the worst kind of Private Information to have been stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

68.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change— Social Security numbers and names.

---

[21] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/
[22] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/
[23] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

69.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

70.    Defendant knew or should have known of the risks and strengthened its data systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

**Defendant Failed to Comply with FTC Guidelines**

71.    The Federal Trade Commission ("FTC") has promulgated many guides for businesses which show how important it is to implement reasonable data security practices. According to the FTC, the need for data security should shape all business decision-making.

72.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[24] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor incoming traffic for activity suggesting someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[25]

73.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

74.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate

---

[24] Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (2016), *available at* www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited April 30, 2025).
[25] *Id.*

1  measures to protect against unauthorized access to confidential consumer data as an unfair act or

2  practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45.

3  Orders resulting from these actions also clarify the measures businesses must take to meet their data

4  security obligations.

5        75.    Defendant failed to properly implement basic data security practices.

6        76.    Defendant's failure to employ reasonable and appropriate measures to protect against

7  unauthorized access to current and former customers' PII constitutes an unfair act or practice

8  prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

9        77.    Defendant was always fully aware of its obligation to protect the PII of its current and

10  former customers. Defendant was also aware of the significant repercussions that would result from

11  its failure to do so.

12  *Defendant Failed to Comply with Industry Standards*

13        78.    Experts studying cybersecurity routinely identify institutions that store PII like

14  Defendant as being particularly vulnerable to cyberattacks because of the value of the PII which they

15  collect and maintain.

16        79.    Some industry best practices that should be implemented by institutions dealing with

17  sensitive PII, like Defendant, include, but are not limited to: educating all employees, strong password

18  requirements, multilayer security including firewalls, anti-virus and anti-malware software,

19  encryption, multi-factor authentication, backing up data, implementing reasonable systems to identify

20  malicious activity, implementing reasonable governing policies, and limiting which employees can

21  access sensitive data. As evidenced by the Data Breach and its timeline, Defendant failed to follow

22  some or all these industry best practices.

23        80.    Other best cybersecurity practices that are standard at large institutions that store PII

24  include: installing appropriate malware detection software; monitoring and limiting network ports;

25  protecting web browsers and email management systems; setting up network systems such as

26  firewalls, switches, and routers; monitoring and protecting physical security systems; and training

27  staff regarding these points.

28  ///

81.    Moreover, a properly trained helpdesk that understands how to face social engineering attacks is an expected part of all cybersecurity programs.

82.    As evidenced by the Data Breach and its timeline, Defendant failed to follow some or all these industry best practices.

83.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

84.    Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

**The Data Breach Caused Plaintiff and the Class Members Injury and Damages**

85.    Plaintiff and members of the proposed Class have suffered injury and damages from the unauthorized disclosure and misuse of their Private Information disclosed in the Data Breach that can be directly traced to Defendant, that has occurred, is ongoing, and/or will imminently occur.

86.    Plaintiff and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

87.    Data Breaches such as the one experienced by Defendant's customers are especially problematic because of the disruption they cause to the daily lives of victims affected by the attack.

88.    As stated prior, on information and belief, in the Data Breach, cybercriminals were able to access the Plaintiff's and the proposed Class Members' Private Information, which is now being used or will imminently be used for fraudulent purposes and/or has been sold for such purposes and posted on the Dark Web for sale, causing widespread injury and damages.

///

///

///

89.     Once an individual's Private Information is for sale and access on the dark web, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[26]

90.     The ramifications of Defendant's failure to keep Plaintiff's and the Class's Private Information secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, or other information, such as addresses, without permission, to commit fraud or other crimes.

91.     Because Defendant failed to prevent the Data Breach, Plaintiff and the proposed Class Members have suffered, will imminently suffer, and will continue to suffer injury-in-fact and damages, including but not limited to:

a.  The loss of privacy and the opportunity to control how Private Information is used;

b.  Unauthorized use of stolen Private Information;

c.  Dramatic increase in spam telephone calls;

d.  Emotional distress and anxiety;

e.  The compromise and continuing publication of their Private Information;

f.  Out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud, and for necessary credit monitoring and identity theft protection;

g.  Lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

h.  The diminution in value of their Private Information;

i.  Delay in receipt of tax refund monies; and,

///

---

[26] Ryan Toohil, *What do Hackers do with Stolen Information*, Aura, (September 5, 2023) https://www.aura.com/learn/what-do-hackers-do-with-stolen-information (last visited April 30, 2025).

j.    The continued risk to their PII, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the PII in its possession.

***The Data Breach Caused Plaintiff and the Class Members Increased Risk of Identity Theft***

92.    Furthermore, the Data Breach has placed Plaintiff and the proposed Class Members at an increased risk of fraud and identity theft.

93.    Plaintiff and Class Members are at a heightened risk of identity theft for years to come, especially because Defendant's failures resulted in Plaintiff's and Class Members' PII falling into the hands of identity thieves.

94.    The unencrypted PII of Class Members has already or will end up for sale on the dark web because that is the *modus operandi* of hackers. Indeed, when these criminals do not post the data to the dark web, it is usually at least sold on private Telegram channels to even further identity thieves who purchase the PII for the express purpose of conducting financial fraud and identity theft operations.

95.    Further, the standard operating procedure for cybercriminals is to use some data, like the PII here, to access "Fullz packages" of that person to gain access to the full suite of additional PII that those cybercriminals have access through other means. Using this technique, identity thieves piece together full pictures of victim's information to perpetrate even more types of attacks.

96.    With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

97.    The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

98.    There are myriad dangers which affect victims of identity theft, including: cybercriminals opening new financial accounts, credit cards, and loans in victim's names; victim's losing health care benefits (medical identity theft); hackers taking over email and other accounts; time and effort to repair credit scores; losing home due to mortgage and deed fraud; theft of tax refunds; hackers posting embarrassing posts on victim's social media accounts; victims spending large amounts of time and money to recover their identities; experiencing psychological harm and emotional distress; victims becoming further victimized by repeat instances of identity theft and fraud; cybercriminals committing crimes in victim's names; victims' personal data circulating the Dark Web forever; victims receiving increased spam telephone calls and emails; victims' children or elderly parents having their identities stolen.

99.    The FTC recommends that identity theft victims take several costly steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, seeking a credit freeze, and correcting their credit reports.[27]

100.    Identity thieves use stolen PII such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

101.    According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases."[28] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[29]

102.    The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and some Class Members, can lead to identity theft and

---

[27] Federal Trade Commission, *What To Do Right Away* (2024), *available at* https://www.identitytheft.gov/Steps (last visited April 30, 2025).
[28] *See* https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases.
[29] *Id.*

1  extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[30]

103.    In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[31] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[32]

104.    Identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's PII to police during an arrest—resulting in an arrest warrant being issued in the victim's name. That can be even more problematic and difficult to remedy for someone who already has a criminal record.

105.    Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.  Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

106.    It is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

---

[30] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf
[31] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/
[32] *See* https://www.investopedia.com/terms/s/ssn.asp

107.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[33]

108.    The California state government warns individuals that: "[o]riginally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[34]

109.    Further, according to the Identity Theft Resource Center's 2021 Consumer Aftermath Report, identity theft victims suffer "staggering" emotional tolls: "For example, nearly 30% of victims have been the victim of a previous identity crime; an all-time high number of victims say they have contemplated suicide. Thirty-three percent reported not having enough money to pay for food and utilities, while 14% were evicted because they couldn't pay rent or their mortgage. Fifty-four percent reported feelings of being violated."

110.    What's more, theft of PII is also gravely serious outside of the traditional risks of identity theft. In the last two decades, as more and more of our lives become interconnected through the lens of massively complex cloud computing, PII are valuable property rights.

111.    PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

112.    Where the most PII belonging to Plaintiff and Class Members was accessible from Defendant's network, there is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and the Class Members are at an increased risk of fraud and identity theft for many years into the future.

///

---

[33] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at:* http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft
[34] *See* https://oag.ca.gov/idtheft/facts/your-ssn

113.    Further, there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which studied data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* GAO Report, at p. 29.

114.    Thus, Plaintiff and the Class Members must vigilantly monitor their financial and credit accounts for many years to come.

115.    Accordingly, the Data Breach has caused Plaintiff and the proposed Class Members a greatly increased risk of identity theft and fraud, in addition to the other injuries and damages set forth herein.

116.    To date, Defendant has done little to provide Plaintiff and Class Members with relief for the damages they have suffered because of the Data Breach, including, but not limited to, the costs and loss of time they incurred because of the Data Breach. Defendant has only offered 12 months of inadequate credit monitoring services, despite Plaintiff and Class Members being at risk of identity theft and fraud for the remainder of their lifetimes.

117.    Defendant knew or should have known of these harms which would be caused by the Data Breach it permitted to occur and strengthened its data systems accordingly.

***Loss of Time to Mitigate Risk of Identity Theft and Fraud***

118.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at an actual, present, immediate, and continuing increased risk of harm from fraud and identity theft.

119.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

///

120.    Because of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that his or her Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm and a Defendant arguing that the individual failed to mitigate damages.

121.    The need to spend time mitigating the risk of harm is especially important in cases like this where Plaintiff's and Class Members' Social Security numbers or other government identification are affected.

122.    By spending this time, data breach Plaintiff was not manufacturing his own harm, he was taking necessary steps at Defendant's direction and because the Data Breach included their Social Security numbers.

123.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience because of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts for any indication of fraudulent activity, which may take years to detect.

124.    These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to his good name and credit record."[35]

///

///

///

///

---

[35] See U.S. Gov't Office, GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), https://www.gao.gov/new.items/d07737.pdf.

*Diminution in Value of Private Information*

125.    PII is a valuable property rights.[36] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

126.    An active and robust legitimate marketplace for Private Information exists. In 2019, the data brokering industry was worth roughly $200 billion.[37]

127.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[38]

128.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[39]

129.    As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

*The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary*

130.    Based on the value of the information stolen, the data either has or will be sold to cybercriminals whose mission it is to perpetrate identity theft and fraud. Even if the data is not posted online, these data are ordinarily sold and transferred through private Telegram channels wherein

---

[36] *See, e.g.*, Randall T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[37] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited April 30, 2025).

[38] https://datacoup.com/ (last visited April 30, 2025).

[39]    Nielsen    Computer    &    Mobile    Panel,    Frequently    Asked    Questions, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited April 30, 2025).

1  thousands of cybercriminals participate in a market for such data so that they can misuse it and earn

2  money from financial fraud and identity theft of data breach victims.

3      131.    Such fraud may go undetected for years; consequently, Plaintiff and Class Members

4  are at a present and continuous risk of fraud and identity theft for many years into the future.

5      132.    Given the risks to Plaintiff and the Class Members, the future cost of credit and identity

6  theft monitoring is both reasonable and necessary.

7      133.    The retail cost of credit monitoring and identity theft monitoring can cost $200 or more

8  per year per Class Member. This is a reasonable and necessary cost to monitor and protect Plaintiff

9  and the Class Members from the risk of identity theft that arose from the Data Breach. This is a future

10  cost for a minimum of seven years that Plaintiffs and Class Members would not need to bear but for

11  Defendant's failure to safeguard their PII.

12  **V.    DEFENDANT'S BREACH**

13      134.    Defendant breached its obligations to Plaintiff and Class Members and/or was

14  otherwise negligent and reckless because it failed to properly maintain and safeguard its computer

15  systems and its data. Defendant's unlawful conduct includes, but is not limited to, the following acts

16  and/or omissions:

17      a.  Failing to maintain an adequate data security system to reduce the risk of data breaches

18          and cyber-attacks;

19      b.  Failing to adequately protect customers' Private Information;

20      c.  Failing to properly monitor its own data security systems for existing intrusions;

21      d.  Failing to store files containing sensitive data in an encrypted state;

22      e.  Failing to train employees in the proper handling of emails containing malicious software,

23          and to and maintain adequate email security practices;

24      f.  Failing to put into place proper procedures, software settings, and data security software

25          protections to adequately protect against a blunt force intrusion;

26      g.  Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the

27          FTC Act; and

28      h.  Failing to adhere to industry standards for cybersecurity.

135.    As the result of computer systems needing security upgrading, inadequate procedures for handling emails containing ransomware or other malignant computer code, and inadequately trained employees who opened files containing the ransomware virus, Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information.

136.    Plaintiff and Class Members now face an increased risk of fraud and identity theft.

## VI.    PLAINTIFF'S AND CLASS MEMBERS' DAMAGES

137.    Defendant has failed to provide Plaintiff and Class Members with relief for the damages they have suffered because of the Data Breach, including, but not limited to, the costs and loss of time they incurred because of the Data Breach. Defendant has only offered 12 months of inadequate credit monitoring services, despite Plaintiff and Class Members being at risk of identity theft and fraud for the remainder of their lifetimes.

138.    The 12 months of credit monitoring offered to persons whose Private Information was compromised is wholly inadequate as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud.

139.    Defendant's failure to compensate is wholly inadequate as it fails to make whole all victims of the Data Breach, who commonly face multiple years of ongoing identity theft, and it provides no compensation for its unauthorized release and disclosure of Plaintiff's and Class Members' Private Information.

140.    Defendant's credit monitoring advice to Plaintiff and Class Members places the burden on Plaintiff and Class Members, rather than on Defendant, to investigate and protect themselves from Defendant's tortious acts resulting in the Data Breach.

141.    Plaintiff and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

142.    Plaintiff's Private Information was compromised and exfiltrated by cyber-criminals as a direct and proximate result of the Data Breach.

///

143. Plaintiff was damaged in that their Private Information is in the hands of cyber criminals.

144. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at an actual, present, immediate, and continuing increased risk of harm from fraud and identity theft.

145. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

146. Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, and similar identity theft.

147. Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

148. Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

149. Plaintiff and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Many courts have recognized the propriety of loss of value damages in related cases.

150. Plaintiff and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

151. Plaintiff and Class Members have suffered or will suffer actual injury as a res of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a. Finding fraudulent charges;

b. Canceling and reissuing credit and debit cards;

c. Purchasing credit monitoring and identity theft prevention;

d. Addressing their inability to withdraw funds linked to compromised accounts;

e.   Taking trips to banks and waiting in line to obtain funds held in limited accounts;

f.   Placing "freezes" and "alerts" with credit reporting agencies;

g.   Spending time on the phone with or at a financial institution to dispute fraudulent charges;

h.   Contacting financial institutions and closing or modifying financial accounts;

i.   Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

j.   Paying late fees and declined payment fees imposed because of failed automatic payments that were tied to compromised cards that had to be cancelled; and

k.   Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

152.   Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by implementing security measures and safeguards, including, but not limited to, making sure that the storage of data or documents containing personal and financial information is inaccessible online and that access to such data is password protected.

153.   Further, because of Defendant's conduct, Plaintiff and Class Members are forced to live with the anxiety that their Private Information —which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

154.   As a direct and proximate result of Defendant's actions and inactions, Plaintiff and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

## VII.   CLASS ACTION ALLEGATIONS

155.   Plaintiff brings this action on behalf of himself and on behalf of all other persons similarly situated pursuant to the Federal Rules of Civil Procedure Rule 23.

///

///

///

156.    Plaintiff proposes the following Class definition, subject to amendment as appropriate:

**All persons whose Private Information was compromised because of the Data Breach reported by Defendant in September 2025 (the "Class").**

157.    Excluded from the Class are Defendant's officers and directors, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families and members of their staff.

158.    Plaintiff reserves the right to amend or modify the class definitions with greater specificity or division after having an opportunity to conduct discovery.

159.    <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them in a single proceeding is impracticable. Upon information and belief, the Class is comprised of thousands of members.

160.    <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

      a.  Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

      b.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

      c.  Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

      d.  Whether Defendant's data security systems prior to and during the Data Breach adhered to industry standards;

      e.  Whether Defendant owed a duty to Class Members to safeguard their Private Information;

      f.  Whether Defendant breached their duty to Class Members to safeguard their Private Information;

///

g.   Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

h.   Whether Plaintiff and Class Members suffered legally cognizable damages from Defendant's misconduct;

i.   Whether Defendant's conduct was negligent;

j.   Whether Defendant's conduct was per se negligent;

k.   Whether Defendant's acts, inactions, and practices complained of herein amount to acts of intrusion upon seclusion under the law;

l.   Whether Defendant was unjustly enriched;

m.   Whether Defendant failed to provide notice of the Data Breach promptly; and

n.   Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

161.   <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, among other things, all Class Members were injured through the common misconduct of Defendant. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class Members, and no defenses are unique to Plaintiff. Plaintiff's claims and those of Class Members arise from the same operative facts and are based on the same legal theories.

162.   <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

163.   <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all Plaintiff's and Class Members', and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

164.     Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy.

165.     The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

166.     Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

167.     Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## VIII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### Negligence

#### (On Behalf of Plaintiff and All Class Members)

168.     Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

169.     Plaintiff and the Class entrusted Defendant with their Private Information.

170.     Plaintiff and the Class entrusted their Private Information to Defendant on the premise and with the understanding that Defendant would safeguard their information, use their PII for business purposes only, and/or not disclose their Private Information to unauthorized third parties.

171.     Defendant knows about the sensitivity of the Private Information and the types of harm that Plaintiff and the Class could and would suffer if the Private Information were wrongfully disclosed.

172.    Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the Private Information of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

173.    Defendant had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendant's security protocols to ensure that the Private Information of Plaintiff and the Class Members in Defendant's possession was adequately secured and protected.

174.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove Private Information it was no longer required to retain under regulations.

175.    Defendant also had a duty to have procedures in place to detect and prevent the improper access and misuse of the Private Information of Plaintiff and the Class.

176.    Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential Private Information, a necessary part of obtaining services from Defendant.

177.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiff or the Class.

178.    A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly given Defendant's inadequate security practices.

179.    Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiff and the Class, the importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendant's systems.

180.    Defendant's own conduct created a foreseeable risk of harm. to Plaintiff and the Class. Defendant's misconduct included, but was not limited to, its failure to take the steps and opportunities

to prevent the Data Breach asset forth herein. Defendant's misconduct also included its decisions not to comply with industry standards for the safekeeping of the Private Information of Plaintiff and the Class, including basic encryption techniques freely available to Defendant.

181.    Plaintiff and the Class had no ability to protect their Private Information that was in, and possibly remains in, Defendant's possession.

182.    Defendant was able to protect against the harm suffered by Plaintiff and the Class because of the Data Breach.

183.    Defendant had and continue to have a duty to adequately disclose that the Private Information of Plaintiff and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Info by third parties.

184.    Defendant had a duty to employ proper procedures to prevent the unauthorized dissemination of the Private Information of Plaintiff and the Class.

185.    Defendant has admitted that the Private Information of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

186.    Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiff and the Class by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the Private Information of Plaintiff and the Class during the time the Private Information was within Defendant's possession or control.

187.    Defendant improperly and inadequately safeguarded the Private Information of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

188.    Defendant failed to heed industry warnings and alerts to provide adequate safeguards to protect the Private Information of Plaintiff and the Class in the face of increased risk of theft.

189.    Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and the Class by failing to have appropriate procedures in place to detect and prevent dissemination of Private Information.

190.    Defendant breached its duty to exercise appropriate clearinghouse practices by failing to remove Private Information it was no longer required to retain under regulations.

191.    Defendant, through its actions and/or omissions, unlawfully breached its duty to adequately and timely disclose to Plaintiff and the Class the existence and scope of the Data Breach.

192.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Nationwide Class, the Private Information of Plaintiff and the Class would not have been compromised.

193.    There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Nationwide Class. The Private Information of Plaintiff and Class Members was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

194.    Additionally, Section 5 of the FTC Act prohibits "unfair ... practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

195.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as detailed herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

196.    Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

197.    Plaintiff and the Class are within the class of persons that the FTC Act was intended to protect.

198.    The harm attributable to the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, because of its

failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

199. As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the present and continuing consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information of Plaintiff and the Class; and (viii) present and continuing costs in terms of time, effort, and money that has been and will be expended to prevent, detect, contest, and repair the effect of the Private Information compromised because of the Data Breach for the rest of the lives of Plaintiff and the Class.

200. As a direct and proximate result of Defendant' negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

201. Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

202. As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have a right to recover actual, consequential, and nominal damages.

///

**SECOND CAUSE OF ACTION**

**BREACH OF IMPLIED CONTRACT**

**(On Behalf of Plaintiff and All Class Members)**

203.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

204.    When Plaintiff and Class Members provided their Private Information to Defendant in exchange for employment and Defendant's services, they entered implied contracts with Defendant under which Defendant agreed to reasonably protect such information.

205.    Defendant solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

206.    In entering such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations, including the Federal Trade Commission Act, and adhered to industry standards.

207.    Plaintiff and Class Members provided labor to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

208.    Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

209.    Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that they adopted reasonable data security measures.

210.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

211.    Defendant breached its implied contracts with Class Members by failing to safeguard and protect their Private Information.

212.    As a direct and proximate result of Defendant's breach of the implied contracts, Class Members sustained damages as alleged here, including the loss of the benefit of the bargain.

213.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered because of the Data Breach.

214.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

### THIRD CAUSE OF ACTION

### UNJUST ENRICHMENT

### (On Behalf of Plaintiff and All Class Members)

215.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

216.    Plaintiff brings this claim individually and on behalf of all Class Members. This count is pled in the alternative to the breach of contract count above.

217.    Upon information and belief, Defendant funds its data security measures entirely from its general revenue.

218.    As such, a portion of the revenue attributable to Plaintiff's and Class Members' labor and payments is to be used to provide a reasonable level of data security.

219.    Plaintiff and Class Members conferred a monetary benefit on Defendant. They staffed Defendant's business and provided labor to Defendant and/or its agents and provided Defendant with payments, directly or indirectly, for financial related services. In so doing, they provided Defendant with their Private Information. In exchange, Plaintiff and Class Members should have received from Defendant the wages and goods that were the subject of the transaction and appropriate protection for their Private Information.

220.    Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

221.    Defendant enriched itself by saving the costs Defendant reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Personal Information. Rather than providing a reasonable level of security that would have prevented the hacking incident,

1    Defendant instead calculated to increase its own profits at the expense of Plaintiff and Class Members

2    by using cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand,

3    suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the

4    requisite security.

5        222.    Under the principles of equity and good conscience, Defendant should not be

6    permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to

7    implement appropriate data management and security measures that are mandated by industry

8    standards.

9        223.    Defendant failed to secure Plaintiff's and Class Members' Private Information and

10   thus did not provide full compensation for the benefit Plaintiff and Class Members provided.

11       224.    Defendant acquired the Private Information through inequitable means in that they

12   failed to disclose the inadequate security practices alleged.

13       225.    If Plaintiff and Class Members knew that Defendant had not reasonably secured their

14   Private Information, they would not have agreed to provide their Private Information to Defendant.

15       226.    Defendant benefitted from collecting and using Plaintiff's and Class Members'

16   sensitive Private Information for business purposes such as evaluating job applications, conducting

17   background checks, and verifying employment eligibility. Yet Defendant failed to bear the costs of

18   safeguarding that same information, instead shifting the risk of harm to the individuals who entrusted

19   their PII.

20       227.    Plaintiff and Class Members conferred a direct and valuable benefit on Defendant by

21   providing their sensitive PII, which Defendant accepted and used in the operation of its business.

22   Because Defendant failed to provide reasonable data protections in exchange, equity and good

23   conscience dictate that Defendant should not be allowed to retain the benefit without providing

24   adequate safeguards.

25       228.    Plaintiff and Class Members gave Defendant their sensitive personal data, a valuable

26   asset in its own right, which Defendant used to further its business operations while cutting costs on

27   security. Defendant's retention of this benefit without adequate protection is inequitable.

28       229.    Plaintiff and Class Members have no adequate remedy at law.

230.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to:

a.    Actual identity theft;

b.    The loss of the opportunity of how their Private Information is used;

c.    The compromise, publication, and/or theft of their Private Information;

d.    Out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information;

e.    Lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft;

f.    The continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and

g.    Future costs in terms of time, effort, and money to be expended to prevent, detect, contest, and repair the effect of the Private Information compromised because of the Data Breach for the rest of the lives of Plaintiff and Class Members.

231.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

232.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

///

///

///

///

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class described above seeks the following relief against Defendant, as follows:

a.  For an Order certifying this action as a class action, defining the Class as requested herein, appointing Plaintiff and his counsel to represent the Class, and finding that Plaintiff is a proper representatives of the Class requested herein;

b.  For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein relating to the misuse and/or disclosure of Plaintiff's, and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

c.  For equitable relief compelling Defendant to use appropriate methods and policies related to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d.  For an Order directing Defendant to pay for not less than ten years of credit monitoring services for Plaintiff and the Class;

e.  For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

f.  For an award of punitive damages, as allowable by law;

g.  For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

h.  Pre- and post-judgment interest on any amounts awarded; and

i.  Any other relief that this court may deem just and proper.

Dated:  October 7, 2025

                                               **KRISTENSEN LAW GROUP & EKSM, LLP**

                                               */s/ John P. Kristensen*

                                               John P. Kristensen
                                               Leigh S. Montgomery*
                                               (* denotes *pro hac vice* forthcoming)

                                               ***Counsel for Plaintiff***



## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial as to the entire action and all Claims for relief.

Dated:  October 7, 2025

**KRISTENSEN LAW GROUP &
EKSM, LLP**

*/s/ John P. Kristensen*
John P. Kristensen
Leigh S. Montgomery*
(* denotes *pro hac vice* forthcoming)

**Counsel for Plaintiff**

1
2
3
4
5
6
7
8
9
10

# EXHIBIT A

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# payactiv

Secure Processing Center
25 Route 111, P.O. Box 1048
Smithtown, NY 11787

Blake Mijangos

96719

September 26, 2025

Dear Blake Mijangos:

Payactiv, Inc. ("Payactiv") recognizes the importance of protecting the personal information we maintain. We are writ
to inform you of a cybersecurity incident that involved some of your information. This letter explains the incident,
measures we have taken, and some steps you may consider taking in response.

Payactiv identified and is taking measures to address a cybersecurity incident that involved unusual activity in our netw
We recently learned that an unauthorized actor viewed information stored in our systems. Upon identifying the issue
immediately activated our response protocols and launched an investigation with the support of third-party cybersec
experts. Law enforcement was notified. Through the investigation, we determined on September 12, 2025, tha
information involved included your name and Social Security number.

We are notifying you about this incident so you can take any necessary precautions. We arranged for you to rec
complimentary 12-month membership of credit monitoring and identity theft protection services by Epiq - Privacy So
ID. These services are completely free to you and enrolling will not hurt your credit score. For more information on
theft prevention, additional steps you can take in response to this incident, and instructions on how to activa
complimentary, 12-month membership, please see the pages that follow this letter.

We sincerely regret that this incident occurred and any inconvenience it may have caused. To help prevent som
this from happening again, we have taken steps to enhance our existing security measures. If you have any questi
call us at 855-291-2491, Monday through Friday, between 6:00 a.m. and 6:00 p.m., Pacific Time.

Sincerely,

Payactiv, Inc.